UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

COLUMBIA DATA PRODUCTS, INC.,   )
                                        )
         Plaintiff,            )
    v.                           )        CIVIL ACTION
                                          )        NO. 11-12077-NMG
AUTONOMY CORPORATION        )
LIMITED, et al.,                )
                                        )
        Defendants.          )

## MEMORANDUM OF DECISION AND ORDER
## ON DEFENDANT'S MOTION TO COMPEL
## AND ON PLAINTIFF'S MOTION TO STRIKE

December 12, 2012

DEIN, U.S.M.J.

## I.  INTRODUCTION

The plaintiff, Columbia Data Products, Inc. ("CDP"), has brought this action

against Autonomy Corporation Limited ("Autonomy") and its predecessors, Iron

Mountain Incorporated and Iron Mountain Information Management, Inc. (collectively,

"Iron Mountain"),[1] alleging that the defendants wrongfully copied and shipped CDP's

computer software, breached the terms of the parties' software license agreement, and

engaged in various misrepresentations aimed at covering up their improper conduct.  Prior

to filing its lawsuit, CDP exercised its right under the parties' license agreement to have

---

[1]  CDP originally named as defendants Autonomy Corporation PLC., Iron Mountain, Inc., Iron Mountain Information Management, Inc., and Connected Corp.  However, pursuant to an Assented-To Motion to Correct Party Names and Caption, the defendants' names have since been changed to reflect the appropriate entities.

an independent accounting firm perform an audit of the defendants' books and records in order to determine the extent to which the defendants had failed to pay royalty fees due to CDP for the alleged misuse of its software.  The audit was performed by the outside accounting firm of PriceWaterhouseCoopers LLC ("PWC"), which concluded that the defendants owed CDP in excess of $23 million in unpaid royalty fees.  By its claims in this action, CDP is seeking, inter alia, at least $23 million in actual damages based on the results of PWC's audit.  CDP is also alleging, based in part on information gained by PWC during the audit, that Iron Mountain has engaged in unfair and deceptive acts and practices by "covering up" the alleged misuse of its software.  The defendants are challenging the completeness and validity of the audit, as well as CDP's claim that PWC was acting as an "independent" auditor at the time it performed its work.

The matter is presently before the court on the "Defendant's Motion to Compel Production of Documents" (Docket No. 28), by which Autonomy is seeking an order compelling the plaintiff to produce documents that relate to PWC's audit and are responsive to Autonomy's first set of requests for the production of documents. According to Autonomy, the documents at issue include drafts of PWC's audit report, emails among PWC and CDP personnel regarding the audit, and emails among CDP's own employees concerning the audit.[2]  The plaintiff claims that the disputed materials have been properly withheld pursuant to the work product doctrine and the attorney-client

---

[2]  The defendants are not seeking documents following PWC's retention as an expert in this case.

privilege.  As described below, this court finds that the plaintiff has failed to establish that the documents at issue constitute work product or are privileged.  Moreover, assuming, arguendo, that the materials are somehow protected from discovery, the plaintiff has failed to prove that any such protections have not been waived.  Accordingly, and for all the reasons described herein, Autonomy's motion to compel is ALLOWED.

Also pending before the court is the plaintiff's "Motion to Strike Affidavit of David A. Frischling" (Docket No. 34), by which CDP is seeking an order striking the Affidavit of Iron Mountain's Corporate Counsel, David A. Frischling ("Frischling"), which was submitted by the defendants in support of Autonomy's motion to compel. CDP contends that this court should strike the Affidavit and award CDP attorney's fees and costs incurred in connection with the preparation of the motion because the defendants failed to disclose Frischling as a witness in its initial disclosure or in any supplemental disclosures.  For the reasons described below, this court finds that the defendants have not violated their disclosure obligations and that no such sanctions are warranted.  Therefore, the plaintiff's motion to strike Frischling's Affidavit is DENIED.

## II.  SCOPE OF THE RECORD - MOTION TO STRIKE

Before addressing the merits of the dispute, it is necessary to determine the scope of the record.  In support of its motion to compel, Autonomy has submitted the Affidavit of David A. Frischling, the Corporate Counsel and Manager, Intellectual Property and Technology, for defendant Iron Mountain, Incorporated.  Therein, Frischling recounts certain of his pre-litigation communications with representatives of CDP regarding the

parties' efforts to resolve their dispute over royalties allegedly owed to CDP and concerning CDP's selection of PWC to perform an audit of the defendants' books and records.  He also describes a Non-Disclosure Agreement that PWC entered into with Iron Mountain prior to performing its auditing work.  CDP has moved to strike Frischling's Affidavit, and for an award of attorney's fees and costs incurred in connection with the preparation of the motion, on the grounds that the defendants failed to disclose Frischling as a potential witness in their initial disclosures under Fed. R. Civ. P. 26(a)(1)(A), or in a supplemental disclosure pursuant to Fed. R. Civ. P. 26(e)(1).  CDP contends that such relief is particularly appropriate because the defendants represented that Frischling had no personal knowledge regarding the dispute, when in fact his Affidavit allegedly reveals that he has relevant personal knowledge.  However, CDP has not established that the defendants' failure to disclose Frischling as a witness, either initially or by way of a supplemental disclosure, violated their obligations under the applicable rules.  Moreover, even assuming the defendants' conduct did constitute a violation, CDP has not shown that it merits the sanctions urged by CDP in its motion to strike.

### **Duty to Disclose Witnesses**

Pursuant to Rule 26(a)(1)(A), a party is required to disclose witnesses that "the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment."  Similarly, under Rule 26(e), a party is required to supplement its disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective infor-

mation has not otherwise been made known to the other parties during the discovery process or in writing[.]"  As explained in the Advisory Committee Notes to Rule 26, "[a] party is no longer obligated to disclose witnesses or documents, whether favorable or unfavorable, that it does not intend to use."  Fed. R. Civ. P. 26, Advisory Comm. Notes, 2000 Amendment.  Moreover, "[t]he disclosure obligation applies to 'claims and defenses,' and therefore requires a party to disclose information it may use to support its denial or rebuttal of the allegations, claim, or defense of another party."  Id.  Accordingly, even if an individual has personal knowledge of facts relevant to the parties' claims and defenses, a party is not obligated to disclose the individual if the party does not intend to use the individual to support its claims or defenses.  See, e.g., Gomas v. City of New York, No. 07-CV-4179 (ARR), 2009 WL 962701, at *2 (E.D.N.Y. Apr. 8, 2009) (unpub. op.) (noting that issue for purposes of automatic disclosure rule is not whether information is discoverable, but whether a party may use it to support its claims or defenses); Ruddell v. Weakley County Sheriff's Dep't, No. 1:07-cv-01159-JGB-egb, 2009 WL 7355081, at *1 (W.D. Tenn. May 22, 2009) (unpub. op.) ("The plain language of the Rule makes clear that the disclosing party must only disclose materials if *that party* intends to use the materials to support its claims or defenses").

In the instant case, the defendants insist that they have no intention of using Frischling as a witness to support their defenses, and that they conveyed that intention to the plaintiff.  (See Def. Opp. to Mot. to Strike (Docket No. 42) at 2, 10).  They also assert that their reliance on Frischling's testimony to support their motion to compel discovery

of withheld documents does not alter the fact that they do not intend to use him as a witness to support their defense.  (See id. at 10).  Moreover, the defendants argue that even if their use of Frischling in connection with the parties' discovery dispute potentially triggered an obligation to supplement their initial disclosures, Frischling's identity and the information contained in his Affidavit already were known to the plaintiff, and, therefore, the defendants were not required to formally disclose him pursuant to Rule 26(e).  (Id.).  This court finds all of these arguments persuasive.

As an initial matter, this court has no reason to question the defendants' representation that they did not intend to use Frischling as a witness to support their defense of this action.  It does not appear that he had personal knowledge of facts regarding the parties' principal claims or defenses, or that the relevant information could not be introduced at trial through other witnesses.  Consequently, it does not appear at this juncture that the defendants will need to rely on Frischling's testimony in order to argue the merits of the dispute or to present their defense at trial.  Accordingly, there was no obligation to include Frischling in the defendants' initial disclosures even if he did have personal knowledge of the claims and defenses at issue in the litigation.

It is undisputed that Frischling does not have personal knowledge about the facts relating to the defendants' alleged wrongful copying and shipment of CDP's software, all of which allegedly occurred before Frischling joined Iron Mountain and are at the heart of the plaintiff's claims.  (See Pl. Reply (Docket No. 62) at 2-3).  Although the plaintiff argues that Frischling may have personal knowledge about events which transpired in

early 2010, while he was in-house counsel of Iron Mountain, and which are relevant to

the defendants' "unlawful scheme to cover up their misconduct" which forms the basis of

plaintiff's 93A claim (id. at 3 (emphasis omitted)), Frischling is not named in the

complaint as having participated in any such wrongful conduct.  (See Compl. ¶¶ 47-59).

Moreover, to the extent that the 93A claim is based on alleged misrepresentations about

what software was shipped or to whom, there is no evidence that Frischling either made

such misrepresentations or had personal knowledge about the veracity of any such

statements.  Furthermore, even if, as CDP argues, Frischling has knowledge of facts

relating to the defendants' defenses, such as details of the parties' communications about

the PWC audit and their efforts to resolve their royalty dispute, there is no indication that

this renders Frischling a necessary witness or that the defendants cannot rely on the

testimony of others to establish the relevant facts.[3]  In short, this court has no reason to

challenge the defendants' entirely plausible representation that they did not intend to call

their counsel as a witness at trial.

---

[3]  To the extent the defendants have asserted defenses based on the parties' settlement
negotiations, it does not appear at this stage that Frischling's testimony is necessary to that
defense.  As an initial matter, the question whether CDP's claims should be stricken because they
are based on confidential or privileged settlement communications raises legal issues that can be
addressed without resorting to fact witness testimony.  Furthermore, there is nothing in the record
indicating that any facts relating to these defenses could not be established through the testimony
of CDP's own witnesses or through means other than the use of Iron Mountain's in-house
counsel.  In any event, as described infra, even if the defendants should have disclosed Frischling
as a percipient witness under Rule 26(a) or (e), any failure to do so was harmless and does not
warrant a ruling striking the Affidavit from the record.

Furthermore, there is no question that Frischling was known to CDP even before this lawsuit was filed.  Not only was CDP a party to the pre-litigation communications described by Frischling in his Affidavit, but CDP also listed Frischling as a witness in its own Rule 26(a)(1) disclosure statement.  (See Frischling Aff. ¶¶ 3, 4, 6 and Ex. B thereto; Aff. of Jason B. Baim in Support of Opp. to Pl. Mot. to Strike (Docket No. 44), Ex. 1 ¶ A(14)).  Thus, to the extent the defendants' decision to use Frischling's testimony to support their motion to compel made him a person whom the defendants "may use to support [their] claims or defenses," his identity had "otherwise been made known" to the plaintiff and he was not required to be named in a supplemental disclosure under Rule 26(e).

## Requested Relief

Even assuming the defendants' failure to disclose Frischling did amount to a violation of Rule 26, CDP has not shown that such conduct would justify its requested relief.  CDP is seeking to strike Frischling's Affidavit pursuant to Fed. R. Civ. P. 37(c)(1).  That Rule provides in relevant part that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Thus, Rule 37 establishes "a self executing sanction which enforces the disclosures required under [Rule 26(a)]."  BASF Corp. v. Sublime Restorations, Inc., — F. Supp. 2d —, 2012 WL 3059374, at *3 (D. Mass. July 26, 2012) (quoting Acadia Ins. Co. v. Cunningham, 771 F.

Supp. 2d 172, 175 (D. Mass. 2011)).  "Unless the failure to disclose is substantially justified or harmless, the failure to disclose triggers the imposition of sanctions under Rule 37(c)(1)."  Id. (quotations and citations omitted).

Here, any disclosure violation resulting from the defendants' failure to list Frischling as a potential witness was harmless.  "The Advisory Committee Notes to the 1993 Amendments to Rule 37(c) 'suggest a fairly limited concept of harmless.'"  Id. (quoting Gagnon v. Teledyne Princeton, Inc., 437 F.3d 188, 197 (1st Cir. 2006)) (internal quotations omitted).  However, because CDP communicated with Frischling about the subjects described in his Affidavit, and listed Frischling as a witness in its own disclosure statement, "the circumstances in the case at bar 'fall squarely within the reach of at least one of the illustrative examples, to wit, a potential witness known to all parties.'"  Id. (quoting Acadia Ins. Co., 771 F. Supp. 2d at 177) (additional quotations and citation omitted).  Accordingly, even if the defendants had failed to comply with their disclosure obligations, their conduct would not warrant the severe sanctions urged by the plaintiff in its motion to strike.  CDP's motion is therefore DENIED, and the evidence set forth in Frischling's Affidavit is incorporated into the following Statement of Facts.[4]

---

[4]  The facts are derived from the following materials submitted by the parties in connection with Autonomy's motion to compel: (1) the Affidavit of David A. Frischling in Support of Motion to Compel Production of Documents (Docket No. 31) ("Frischling Aff."); (2) the Affidavit of Jason B. Baim in Support of Motion to Compel Production of Documents (Docket No. 32) ("Baim Aff."); (3) the exhibits attached to the Affidavits of David A. Frischling and Jason B. Baim (Docket Nos. 31 and 32), and to the Supplemental Affidavit of Jason B. Baim in Support of Motion to Compel Production of Documents (Docket No. 61) ("Def. Ex. __"); (4) the Affidavit of Alan Welsh in Support of Opposition to Motion to Compel Production of Documents (Docket No. 47) ("Welsh Aff.") and the exhibits attached thereto (Docket No. 54) ("Pl. Ex.__"); and (5)

### III.  **STATEMENT OF FACTS**

### **The License Agreement**

Plaintiff CDP develops, markets, distributes and supports computer software products.  (Welsh Aff. ¶ 2).  The CDP product at issue in this case enables computers and servers to back up "open files" in real time.  (<u>Id.</u>).  "Open files" are files that are in use and are being changed by users.  (<u>Id.</u>).  Because such files would not be backed up without the use of CDP's open file backup software, CDP's product is critical to users. (<u>Id.</u>).

CDP maintains all rights and interest in the federally registered copyrights covering its open file backup software, and it has licensed its software to some of the largest computer companies in the world.  (<u>Id.</u>).  In March 2005, CDP entered into an OEM Partner Agreement ("License Agreement") with Iron Mountain's predecessor, Connected Corporation ("Connected"), pursuant to which CDP granted Connected (and Iron Mountain as Connected's successor) a license to integrate, market, and distribute CDP's open file backup software in the manner and to the extent set forth in the Agreement.  (<u>See</u> Pl. Ex. A ¶¶ 1-4).  Significantly, pursuant to the License Agreement, the parties agreed that Iron Mountain would pay CDP a royalty of 10% of the net revenue received for each Iron Mountain server product listed on Exhibit B to the Agreement, and

---

the Affidavit of Zachary C. Kleinsasser in Support of Opposition to Motion to Compel Production of Documents (Docket No. 48) ("Kleinsasser Aff.") and the exhibits attached thereto ("Pl. Supp. Ex.__").

a royalty of 10% of the monthly net revenue generated for each maintenance, service, or subscription contract Iron Mountain received for those server products.  (Id. at Ex. A ¶ 8(a)-(b)).  They also agreed that CDP would have the right to retain an independent accounting firm to conduct an audit of Iron Mountain's books and records as follows:

> [Iron Mountain] shall prepare and maintain detailed books and records, in accordance with generally accepted accounting practices and procedures consistently applied, relative to all licensing and sub-licensing of the PRODUCT, the Documentation, and OS Ports. Such books and records shall be reviewed not more frequently than once during each twelve (12) month period.  Representatives of the auditing firm shall protect the confidentiality of [Iron Mountain's] information and abide by [Iron Mountain's] reasonable security regulations while on [Iron Mountain's] premises.  In the event CDP auditors determine that [Iron Mountain] has underreported or under-paid royalty fees due to CDP, [Iron Mountain] shall immediately pay such underpaid amount to CDP.  If the underpayment is more than 5% for three consecutive calendar quarters, [Iron Mountain] shall also pay all costs of performing the audit.  Failure to promptly pay any undisputed fees constitutes grounds for termination of this AGREEMENT by CDP.  For a minimum of two (2) years after the end of each year (including after termination of this AGREEMENT), CDP will have the right to have a recognized independent accounting firm conduct an audit of such books and records from time to time. This audit shall be conducted at CDP's expense, during [Iron Mountain's] normal business[.]

(Id. at Ex. A ¶ 8(e)) (emphasis added).  Autonomy's motion to compel arises out of PWC's performance of a royalty audit pursuant to this provision of the License Agreement, after which PWC determined that the defendants owed CDP over $23 million in underpaid royalty fees and were responsible for all costs incurred in performing the audit.

## The Parties' Dispute Over Royalty Payments

In 2008, CDP determined that it had not received any royalty payments under the License Agreement, and it began making efforts to obtain royalty information from Iron Mountain.  (Pl. Ex. B).  In August 2008, Iron Mountain advised CDP that, to the best of its knowledge, the Connected server product which had incorporated CDP's software had not been a success, and that Iron Mountain was using "LiveVault," another server which incorporated CDP's software, as its primary server product.  (See Welsh Aff. ¶ 4; Pl. Ex. B).  Iron Mountain also advised CDP that only a handful of Connected Server products had been shipped, although the exact number was unknown.  (Id.).  According to CDP, the plaintiff relied on these statements, and believed that either there were no royalties to report under the License Agreement or any royalties relating to the License Agreement were reported to CDP in Iron Mountain's LiveVault royalty reports.  (Welsh Aff. ¶ 4).

CDP claims that in the spring of 2010, it discovered from the defendants' own documents that, in contrast the defendant's prior representations, Iron Mountain had shipped Connected server products containing CDP software.  (Id. ¶ 5).  It also claims that at about the same time, CDP learned of facts indicating that the defendants had been secretly integrating CDP's software into products that were not authorized under the terms of the License Agreement.  (Id. ¶ 8).  After CDP confronted the defendants regarding these claims, the parties entered into negotiations aimed at reaching a settle-ment agreement addressing the issue of royalty payments.  (See, e.g., Pl. Exs. C, E, G, K, O, P).  As the parties' settlement communications demonstrate, both parties understood

that in the event no settlement could be reached, litigation was likely to follow.  (See, e.g.. Welsh Aff. ¶¶ 14-15, 17-18; Pl. Ex. K ¶¶ 11, 15; Pl. Ex. N at 1).

By late 2010, it became increasingly clear that the parties had very different views on how royalties were intended to be calculated under the License Agreement, and on the amount of royalties, if any, that were due to CDP from Iron Mountain.[5]  (See, e.g., Frischling Aff. ¶¶ 3-4; Pl. Ex. N).  Also by that time, CDP believed that litigation with the defendants was a real possibility.  (Welsh Aff. ¶ 10).  Accordingly, the plaintiff sought legal assistance from its outside counsel, and it retained litigation counsel from Greenberg Traurig, LLP, the firm that is representing CDP in the present action.  (Id.).  However, it appears that CDP did not advise Iron Mountain that litigation counsel was involved in any way with these efforts to resolve the dispute over royalty payments.  (Frischling Aff. ¶ 6).

## PWC's Performance of the Royalty Audit

By February 2011, CDP concluded that the parties had reached an impasse regarding the royalty issue, and it decided to exercise its right under the License Agreement to conduct an audit of the defendants' books and records.  (Welsh Aff. ¶ 12).  According to CDP, it never would have pursued an audit if it had not believed that there was a real possibility of litigation, and that an audit was necessary to "give CDP the full story" with respect to Iron Mountain's use of its software.  (Id. ¶ 13).  Consequently,

---

[5]  Because the substance of the parties' dispute over royalties is not germane to the instant discovery motion, it has not been described herein.

unbeknownst to Iron Mountain, on February 25, 2011, counsel from Greenberg Traurig,

acting on behalf of CDP, entered into an engagement letter with PWC whereby PWC

agreed to perform certain services "to assist [Greenberg Traurig] in connection with [its]

giving legal advice to [CDP]." (Id. ¶ 12; Pl. Ex. I at 1).  The letter, which is addressed to

Greenberg Traurig and signed by PWC, described the scope of the services that PWC

would provide as follows:

> You and your Client are engaging us to provide the following
> services (the "Services"):
>
> You have engaged us to perform certain procedures in order to
> analyze and quantify software license fees payable to you by Iron
> Mountain ("IRM"), in respect to CDP's open file handler tool
> deployed in IRM's Connected Backup product.
>
> We will perform the Services in accordance with the Standards for
> Consulting Services established by the American Institute of
> Certified Public Accountants ("AICPA").  Accordingly, we will
> provide no opinion, attestation or other form of assurance with
> respect to our work or the information upon which our work is
> based.  The procedures we will be performing under this Agreement
> will not constitute an examination or a review in accordance with
> generally accepted auditing standards or attestation standards.  We
> will not audit or otherwise verify the information supplied to us in
> connection with any engagement under this Agreement, from
> whatever source, except as may be specified in this Agreement.
>
> The Services do not include the provision of legal advice and PwC
> makes no representations regarding questions of legal interpretation.
> Client should consult with its attorneys with respect to any legal
> matters or items that require legal interpretation, under federal, state
> or other type of law or regulation.

(Pl. Ex. I at 1 (emphasis added)).  Thus, although, as detailed below, PWC ultimately was

retained to provide expert testimony on behalf of CDP in this action, as of February 2011,

when PWC agreed to perform a royalty audit on behalf of CDP, it expressly declined to render any opinions or assurances with respect to its work, or to provide legal advice to CDP.

CDP took no steps to inform Iron Mountain that PWC had been retained by litigation counsel, or that it was involved in any capacity other than as an independent auditor pursuant to the parties' agreements.  Thus, on March 18, 2011, CDP, through its business lawyer who had been involved in discussions to date, informed Iron Mountain that, pursuant to the rights granted to it in the License Agreement, "CDP has chosen PricewaterhouseCoopers to perform an audit of Iron Mountain's books and records relating to all licensing and sublicensing of CDP's products."  (Pl. Ex. J).  The contact person was identified as an in-house counsel, not litigation counsel.  (Id.).  CDP also acknowledged the sensitivity of the audit, and worked with Iron Mountain to draft a Non-Disclosure Agreement ("NDA") that would maintain the confidentiality of the information provided to PWC by Iron Mountain.  (See Frischling Aff. ¶¶ 4-5; Def. Ex. B).  The NDA, which was executed by Iron Mountain and PWC in April 2011, explained that CDP wished to exercise its rights under the License Agreement to examine Iron Mountain's books and records relative to the licensing and sublicensing of CDP's software, and that CDP had engaged PWC "to conduct an audit of Iron Mountain pursuant to Section 8(e) of the [License Agreement]."  (Def. Ex. C at 1).  Additionally, pursuant to the NDA, PWC agreed to maintain as confidential information all of the information provided to it by Iron Mountain in the course of the audit process, and

expressly covenanted that it would use the confidential information "solely for the purposes of exercising CDP's audit rights under the [License Agreement]."  (Id.; see also Frischling Aff. ¶ 5).

At all times before and during the PWC audit, PWC was described to Iron Mountain as an "independent" auditor that had been retained by CDP for the sole purpose of exercising its audit rights under the terms of the License Agreement.  (Frischling Aff. ¶ 6).  Neither CDP nor PWC ever advised Iron Mountain that PWC had been retained by plaintiff's counsel, and they never informed Iron Mountain that PWC had been retained to provide expert advice in anticipation of litigation or to provide expert testimony during any such litigation.  (Id.).  According to Iron Mountain's in-house counsel, he relied on the representations of PWC's independence when he arranged for PWC to have access to sensitive financial information and to conduct interviews of Iron Mountain personnel.  (Id.).  The defendants claim that Iron Mountain never would have allowed PWC to conduct the audit in the manner that it did if Iron Mountain had been advised that PWC had been retained by CDP's litigation counsel or was acting as an expert for anticipated litigation.  (Id.).

PWC conducted the royalty audit pursuant to the License Agreement and the NDA during the time period from February through June 2011.  (See Def. Ex. D at 1).  However, as PWC explained in a letter to Autonomy dated July 22, 2011, the auditors were unable to complete the work because they required additional information from the defendants.  (See Def. Ex. D at 1-2).  Nevertheless, on August 12, 2011, PWC issued an

interim report to CDP based on the facts that had been gathered to date.  (See id. at 2; Def. Ex. E).  As described in its cover letter to CDP enclosing the interim report, PWC determined that Iron Mountain had included CDP software in products that were not authorized under the terms of the License Agreement, and that it owed CDP royalties of over $23 million.  (Def. Ex. E at 1).  It also determined that Iron Mountain's underpayment of royalties was sufficiently extensive to trigger its obligation to reimburse CDP for costs related to PWC's performance of the audit.  (Id.).

PWC also specified in its cover letter that its report "and all PwC deliverables are intended solely for the management and Board of Directors of CDP for their internal use and benefit[,]" and could not be discussed with or disclosed to third parties without PWC's prior consent.  (Id. at 2).  PWC did agree that CDP personnel could "discuss" the contents of the report with the defendants, but it did not authorize CDP to distribute the report to the defendants unless written releases of PWC had been received from them first.  (Id. (emphasis in original)).  Notwithstanding these restrictions, CDP's counsel provided a copy of the draft report to Autonomy on October 10, 2011 "[t]o facilitate [the parties'] efforts to resolve the issues that have been raised concerning amounts due to [CDP]."  (Pl. Ex. R at 1).  However, the parties were not able to resolve those issues, and this litigation ensued.

## Events Leading to the Present Discovery Dispute

CDP filed its complaint in this action on November 23, 2011.  Therein, CDP has asserted claims against the defendants for copyright infringement, breach of contract,

breach of the implied covenant of good faith and fair dealing, and unfair and deceptive

trade practices pursuant to Mass. Gen. Laws ch. 93A.  (Compl. (Docket No. 1) at Counts

I-IV).  In its breach of contract claim, CDP asserts that it "exercised its right under the

License Agreement to audit Defendants' books and records" and that it "retained the

independent accounting firm of [PWC] to perform the royalty audit of Defendants'

records."  (Id. ¶¶ 29-30).  CDP further alleges that "[a]fter a detailed review of the

records made available by Defendants and interviews of Iron Mountain personnel, PWC

determined the estimated royalties due to be in excess of $23 million."  (Id. ¶ 31).  Thus,

in addition to seeking "Defendants' payment of all costs of performing the audit as

provided for in the License Agreement[,]" (id. ¶ 35), CDP is seeking actual damages of at

least $23 million.  (See id. at 11).  In addition to relying on PWC's independent audit of

Iron Mountain's books and its interviews with Iron Mountain's employees in connection

with its breach of contract claim, CDP also relies on "Price Waterhouse's interview with

Bob Mulcahey, Defendants' Director of Engineering" in connection with its contention

that the defendants have violated Mass. Gen. Laws ch. 93A.  (Id. ¶ 54).  Similarly, in its

initial disclosure statement provided under Fed. R. Civ. P. 26(a)(1), CDP characterized

PWC as an "independent" auditor that had conducted a royalty audit pursuant to the

parties' License Agreement, and it identified "[d]ocuments concerning royalty audit

performed by PWC" among the documents that it may use to support its claims in this

action.  (See Def. Ex. G at 17-18).  Thus, in the early stages of this litigation, CDP

consistently maintained that the audit was conducted by PWC, an independent auditor,

pursuant to the Licensing Agreement, and has relied on the information gathered by the "independent auditor" to support its claims.

PWC's status changed in June 2012, when Greenberg Traurig, acting on its own behalf and as counsel for CDP, retained PWC as a testifying expert in this case. (See Def. Ex. Q). Specifically, in a June 5, 2012 letter from PWC to Greenberg Traurig, PWC agreed to update its interim audit report so that it could be used for expert witness testimony in this matter. (Id.). It also agreed to create a rebuttal expert report, and to provide expert witness deposition and trial testimony. (Id.). As detailed below, CDP has since taken the position that it should not be required to produce any documents regarding the royalty audit beyond the materials specified in Fed. R. Civ. P. 26(b)(4) relating to discovery involving expert witnesses.[6] (See Pl. Supp. Ex. C at 1-2; Pl. Opp. Mem. (Docket No. 45) at 9-10, 17-20).

On June 18, 2012, CDP served its response to Autonomy's First Set of Requests for Production of Documents. (See Pl. Supp. Exs. A & B). Therein, CDP objected to requests seeking documents underlying and relating to the royalty audit, and declined to produce any documents responsive to those requests other than the PWC audit report and communications between PWC and the defendants. (See Pl. Supp. Ex. B at 20-21). The parties subsequently engaged in a meet and confer process, and CDP ultimately agreed to

---

[6] Fed. R. Civ. P. 26(b)(4) was amended in 2010 "to provide work-product protection against discovery regarding draft expert disclosures or reports and – with three specific exceptions – communications between expert witnesses and counsel." Fed. R. Civ. P. 26, Advisory Comm. Notes, 2010 Amendment.

produce additional documents, but with certain limitations.  (See Def. Exs. K-N).  Speci-

fically, CDP informed the defendants that PWC was expected to testify as CDP's expert

witness, and that, in accordance with Fed. R. Civ. P. 26(b)(4), CDP would produce

communications regarding PWC's compensation; communications identifying facts or

data provided to PWC by counsel; communications identifying assumptions provided to

PWC by counsel; communications between PWC and Defendants; and the PWC royalty

audit.  (Def. Ex. N at 1-2).  However, CDP asserted that under Rule 26(b)(4), it was not

obligated to produce drafts of PWC's report (presumably beyond the draft already

produced) or any communications between PWC and CDP's counsel other than those

specified in the Rule.  (Id.).  Because the plaintiff refused to comply with the defendants'

requests for additional documents relating to the PWC audit, Autonomy filed the instant

motion to compel.  (See Baim Aff. ¶¶ 15-16).

Additional factual details relevant to this court's analysis are described below

where appropriate.

## IV.  ANALYSIS

By its motion, Autonomy is seeking an order compelling CDP to produce docu-

ments that are responsive to its First Set of Requests for the Production of Documents and

relate to the royalty audit performed by PWC pursuant to the parties' License Agreement.

As described by Autonomy, the disputed documents consist of drafts of PWC's interim

audit report, emails between PWC and CDP relating to the audit, and emails among

CDP's own employees concerning the audit.[7]  (Def. Mem. (Docket No. 29) at 10).  The

defendants argue that the disputed documents are discoverable because the privileges

asserted by the plaintiff pursuant to Fed. R. Civ. P. 26 do not apply, and even if they did,

they were waived by CDP's decision to place PWC's audit at issue in the litigation and

by its voluntary disclosure of the interim audit report to the defendants.

CDP originally took the position that PWC was its expert, and, therefore, that its

discovery obligations were limited to those required by Fed. R. Civ. P. 26(b)(4).  (Def.

Ex. N).  While CDP now contends that it "does *not* take the position that PWC Materials

are protected from disclosure pursuant to Rule 26(b)(4)," it does contend that the

materials are nevertheless shielded from discovery under the attorney-client privilege and

under the work product doctrine pursuant to Fed. R. Civ. P. 26(b)(3).  (Pl. Opp. Mem. at

10-11 (emphasis in original)).  It further contends that no waiver has occurred, and in any

event, fairness concerns dictate that any waiver should not require disclosure beyond

what already has been produced to the defendants.

"The party invoking a recognized privilege has the burden of establishing, not only

the existence of that privilege, but also that the established privilege was not waived."

Cavallaro v. United States, 153 F. Supp. 2d 52, 56 (D. Mass. 2001), aff'd 284 F.3d 236

(1st Cir. 2002).  Similarly, "[t]he party seeking work product protection has the burden of

---

[7]  This court understands that Autonomy is not seeking communications between CDP
and its counsel concerning the audit.  It is also not seeking information created after June 5, 2012,
when PWC was retained as an expert, beyond that required by Fed. R. Civ. P. 26(b)(4).

establishing its applicability." In re Grand Jury Subpoena, 220 F.R.D. 130, 141 (D. Mass. 2004).  As detailed below, this court finds that the plaintiff has not met its burden of showing that the work product doctrine or the attorney-client privilege applies to the challenged documents.  This court further concludes that even if CDP could show that the documents warranted protection in the first instance, any such protection has been impliedly waived.

### A.  **Application of the Work Product Doctrine**

CDP first contends that the disputed materials are protected from discovery under the work product doctrine.  The work product doctrine, which was first articulated by the Supreme Court in Hickman v. Taylor, 329 U.S. 495, 67 S. Ct. 385, 91 L. Ed. 451 (1947), and was partially codified in Fed. R. Civ. P. 23(b)(3), "protects against disclosure of materials that a party, her attorney, or her representative prepares in anticipation of litigation[.]" In re Grand Jury Subpoena, 220 F.R.D. at 141.  Thus, "[t]he work product doctrine preserves a 'zone of privacy' in which a party, his attorney, and in many cases his non-attorney 'representative' can prepare for litigation, 'free from unnecessary intrusion by his adversaries.'" Id. (quoting United States v. Adlman, 134 F.3d 1194, 1196 (2d Cir. 1998)).

In the instant case, CDP argues that the materials at issue were prepared in anticipation of litigation as required under the work product doctrine due to the fact that they "were prepared because of the prospect of litigation."  (Pl. Opp. Mem. at 13).  While CDP acknowledges that PWC conducted its audit pursuant to the parties' License

Agreement, it asserts that this does not matter since the audit also was performed in anticipation of litigation against the defendants.  (See id. at 13-14).  Based on the First Circuit's most recent articulation of the test for determining whether documents are prepared in anticipation of litigation, this court concludes that CDP has not shown that the materials relating to the PWC audit fall within the scope of the work product doctrine.

In support of its arguments, CDP relies on the First Circuit's decision in Maine v. United States Dep't of the Interior, 298 F.3d 60 (1st Cir. 2002).  There the First Circuit, in interpreting the phrase "in anticipation of litigation" adopted the standard applied by a number of other circuits holding that documents serving both a business purpose and a litigation purpose may be protected as work product "if, 'in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained *because of* the prospect of litigation.'"  Maine, 298 F.3d at 68 (quoting United States v. Adlman, 134 F.3d 1194, 1202 (2d Cir. 1998)) (emphasis in original).  The court explained that under this test, no protection would attach to "'documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation[,]'" even if the documents would "aid in the preparation of litigation."  Id. at 70 (quoting Adlman, 134 F.3d at 1202).  On the other hand, documents prepared for both a business purpose and "because of" existing or expected litigation, would warrant protection under the work product rule.  See id. at 68.

More recently, the First Circuit, in an *en banc* opinion, adopted a narrower test which asks whether the documents or materials at issue were "prepared *for use* in possible litigation[.]"  United States v. Textron Inc. & Subsidiaries, 577 F.3d 21, 27 (1st Cir. 2009) (en banc) (emphasis in original).  See also id. at 32 (Torruella, J., dissenting) (explaining majority's abandonment of the "because of" test articulated in Maine in favor of a narrow, "prepared for" test).  As the First Circuit reasoned in that case:

> From the outset, the focus of work product protection has been on materials prepared for use in litigation, whether the litigation was underway or merely anticipated.  Thus, *Hickman v. Taylor* addressed "the extent to which a party may inquire into oral and written statements of witnesses, or other information, secured by an adverse party's counsel *in the course of preparation for possible litigation* after a claim has arisen."  329 U.S. at 497, 67 S. Ct. 385 (emphasis added).  Similarly, the English privilege, invoked by *Hickman v. Taylor*, privileged "documents which are called into existence for *the purpose – but not necessarily the sole purpose – of assisting the deponent or his legal advisers in any actual or anticipated litigation."  Id.* at 510 n.9, 67 S. Ct. 385 (emphasis added) (internal quotation marks omitted).

> The phrase used in the codified rule – "prepared in anticipation of litigation or for trial" did not, in the reference to anticipation, mean prepared for some purpose other than litigation: it meant only that the work might be done *for* litigation but *in advance of* its institution. The English precedent, doubtless the source of the language of Rule 26, specified the purpose "of assisting the deponent or his legal advisers in any actual or anticipated litigation ...."

Id. at 29 (emphasis in original).  Thus, the court concluded,

> [i]t is not enough to trigger work product protection that the *subject matter* of a document relates to a subject that might conceivably be litigated.  Rather, as the Supreme Court explained, "the literal language of [Rule 26(b)(3)] protects materials *prepared for* any

> litigation or trial as long as they were prepared by or for a party to
> the subsequent litigation."

Id. (quoting Fed. Trade Comm'n v. Grolier Inc., 462 U.S. 19, 25, 103 S. Ct. 2209, 76 L. Ed. 387 (1983)) (emphasis in original).

The record before this court does not support a determination that PWC's audit materials were prepared for litigation. The evidence shows that PWC was engaged, pursuant to the License Agreement, in order to "give CDP the full story" regarding Iron Mountain's use of its software. (Welsh Aff. ¶ 13). Accordingly, CDP notified Iron Mountain that it was invoking its right to conduct an audit under Section 8(e) of the License Agreement, and it repeatedly described PWC to Iron Mountain as an "independent" auditor that was retained for the sole purpose of exercising CDP's rights under the parties' contractual agreement. (See Frischling Aff. ¶¶ 5-6; Pl. Ex. J; Def. Ex. C at 1). CDP never suggested to the defendants that PWC had been retained to provide expert advice in anticipation of litigation. (Frischling Aff. ¶ 6). Had it done so, Iron Mountain would not have given PWC access to its sensitive financial information or allowed it to interview its employees. (Id.). Thus, CDP's own communications belie any conclusion that the audit was performed for the purpose of litigation.

CDP's representations to Iron Mountain regarding the nature of PWC's engagement were consistent with the scope of services described in PWC's engagement letter. Therein, PWC expressly agreed to perform procedures aimed at analyzing and quantifying royalty fees. (See Pl. Ex. I at 1). However, it specifically declined to provide any

opinions, attestations or assurances, and disclaimed any suggestion that its work included legal advice.  (Id.).  It was only in 2012, when the parties were engaged in the ongoing litigation, that PWC agreed to update its interim report so that it could be used as expert opinion.  (See Def. Ex. Q).  These facts show that PWC's work was aimed at uncovering facts regarding royalties owed to CDP under the License Agreement.  They do not indicate, or even suggest, that it was conducted for use in a future lawsuit.

Indeed, the record demonstrates that the audit report and communications relating to the audit were intended only for CDP's internal use, and not for the purpose of litigation.  Under the NDA, PWC agreed to maintain the confidentiality of all information provided to it by Iron Mountain, and to use such information "solely for the purposes of exercising CDP's audit rights under the [License Agreement]."  (Def. Ex. C at 1).  Additionally, PWC expressly stated when it delivered the draft audit report that the report and all PWC deliverables were intended solely for the internal use and benefit of CDP's management and Board of Directors.  (Def. Ex. E at 2).  Such evidence is entirely inconsistent with the notion that the PWC materials were prepared for litigation or for use at trial.

Even assuming the "because of" standard articulated by the First Circuit in Maine were to apply here, the plaintiff has not shown that the work product doctrine would shield the disputed documents from discovery.  As described above, "the 'because of' standard does not protect from disclosure 'documents . . . that would have been created in essentially similar form irrespective of the litigation.'"  Maine, 298 F.3d at 70 (quoting

-26-

<u>Aldman</u>, 134 F.3d at 1202).  Although CDP may have believed that litigation was a real possibility, and its decision to retain litigation counsel stemmed from that belief, the record demonstrates that the audit was conducted to determine how much, if anything, Iron Mountain owed under the License Agreement, not for litigation purposes.  CDP's need to understand the "full story" regarding Iron Mountain's use of its software, the repeated representations before and after the complaint was filed that the audit was performed for purposes of exercising CDP's rights under the License Agreement, the promises of confidentiality, and counsel's disclosure of the interim report to Autonomy to facilitate the parties' further efforts to resolve their dispute over royalty payments, indicate that the audit would have occurred, and the disputed materials would have been generated, in the same manner under any circumstances.  Accordingly, the plaintiff has not shown that the disputed documents are subject to protection under the work product doctrine under either the <u>Maine</u> or <u>Textron</u> standards.

### B.  <u>Application of the Attorney-Client Privilege</u>

The plaintiff argues that the attorney-client privilege also warrants the denial of Autonomy's motion to compel.  However, CDP has not established that the privilege applies or that it has not been waived.

### <u>The Attorney-Client Privilege – In General</u>

The attorney-client privilege "protects only those communications that are confidential and are made for the purpose of seeking or receiving legal advice."  <u>In re</u>

Keeper of the Records (Grand Jury Subpoena Addressed to XYZ Corp.), 348 F.3d 16, 22

(1st Cir. 2003).  The essential elements of the privilege are as follows:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

Cavallaro v. United States, 284 F.3d 236, 245 (1st Cir. 2002).  Although "[t]he attorney-

client privilege is well-established[,]" it "must be narrowly construed because it comes

with substantial costs and stands as an obstacle of sorts to the search for truth."  In re

Keeper of the Records, 348 F.3d at 22.

"In contrast to the attorney-client privilege, 'no confidential accountant-client

privilege exists under federal law.'"[8]  Cavallaro, 284 F.3d at 246.  Therefore,

"accountant-client communications are privileged [only] if they meet the traditional

requirements of the attorney-client privilege."  Id.

As described above, the documents at issue consist of drafts of PWC's audit,

emails among PWC and CDP regarding the audit, and emails among CDP's own

employees concerning the audit.  CDP has not attempted to explain how emails among

CDP's employees meet any of the elements of the attorney-client privilege.  (See Pl.

---

[8] Pursuant to 26 U.S.C. § 7525, Congress created a limited privilege for accountant-client communications.  Cavallaro, 284 F.3d at 246 n.5.  However, that privilege only relates to tax advice, and it applies only in noncriminal tax matters before the Internal Revenue Service and in noncriminal tax proceedings brought in Federal court by or against the United States.  See 26 U.S.C. § 7525.  Consequently, it is not applicable here.

Mem. at 15-16).  Therefore, it has not met its burden of showing that such documents are

protected.  With respect to the remaining materials, CDP argues that the privilege applies

because PWC was retained by CDP's litigation counsel, Greenberg Traurig, to assist

them in rendering legal advice to CDP.  (Id.).  For the reasons that follow, this argument

too lacks merit.

### Disclosures to Third Parties

Generally, the attorney-client privilege applies only to communications between

an attorney and the client, and the disclosure of such communications to a third-party

undermines the confidentiality of the communications or waives the privilege.  See

Cavallaro, 284 F.3d at 246.  "An exception to this general rule exists for third parties

employed to assist a lawyer in rendering legal advice."  Id. at 247.  However, "an

attorney, merely by placing an accountant on her payroll, does not, by this action alone,

render communications between the attorney's client and the accountant privileged."  Id.

at 247.  Rather, in order for the exception to apply, three separate elements must be met.

See Dahl v. Bain Capital Partners, 714 F. Supp. 2d 225, 227-28 (D. Mass. 2010).

The first element that must be satisfied in order for the exception to apply is that

"the third-party communications must be 'necessary, or at least highly useful, for the

effective consultation between the client and the lawyer which the privilege is designed to

permit.'"  Id. (quoting Cavallaro, 284 F.3d at 247-48) (additional citation omitted).  This

"'necessity' element means more than just useful and convenient . . . The involvement of

the third party must be nearly indispensable or serve some specialized purpose in

facilitating the attorney-client communications." Id.  It is not enough that "the communi-cation proves important to the attorney's ability to represent the client." United States v. Ackert, 169 F.3d 136, 139 (2d Cir. 1999) (rejecting extension of attorney-client privilege to conversations between client's counsel and an independent investment banker despite assumption that "those conversations significantly assisted the attorney in giving his client legal advice about its tax situation").

The second element necessary for the exception to apply is that the third party must play "an interpretive role.  In other words, the third party's communication must serve to translate information between the client and the attorney." Dahl, 714 F. Supp. 2d at 228, and cases cited.  The exception does not apply where the lawyer merely obtains information from the third party in order to give advice to the client.  See Ackert, 169 F.3d at 139 (finding that exception did not apply where attorney sought out third party for information regarding proposed transaction and its tax consequences, but did not rely on third party to "translate or interpret information given to [attorney] by his client").

The third and final element necessary to bring a third party's communications within the scope of the attorney-client privilege is that "the third party's communication must be made for the purpose of rendering legal advice, rather than business advice." Dahl, 714 F. Supp. 2d at 228.  In the case of an accountant, "[i]f what is sought is not legal advice but only accounting service . . . , or if the advice sought is the accountant's rather than the lawyer's, no privilege exists." Cavallaro, 284 F.3d at 247 (quoting United States v. Kovel, 296 F.2d 918, 922 (2d Cir. 1961)).

The evidence in the instant case does not meet the relevant test.  The only evidence that CDP points to is the February 25, 2011 engagement letter from PWC to Greenberg Traurig.  (See Pl. Opp. Mem. at 15-16).  While the letter indicates that PWC agreed to perform services intended to assist counsel with its provision of legal advice to CDP, neither the letter nor any other evidence set forth in the record suggests that PWC "was necessary, or at least highly useful, in facilitating the legal advice" or that Greenberg Traurig was relying on PWC to translate or interpret information between the lawyers and CDP.  See Dahl, 714 F. Supp. 2d at 229.  As described in the engagement letter, PWC specifically declined to provide legal advice or to assist with legal matters.  (See Pl. Ex. I at 1).  Rather, its stated role was limited "to analyz[ing] and quantif[ing] software license fees payable to [CDP] by Iron Mountain[.]"  (Id.).  Nothing in the materials submitted by either of the parties undermines that description.  Therefore, PWC's function "was not to put information gained from [plaintiff] into usable form for [its] attorneys to render legal advice, but rather, to collect information not obtainable directly from [plaintiff]."  Occidental Chem. Corp. v. OHM Remediation Servs. Corp., 175 F.R.D. 431, 433 (W.D.N.Y. 1997).

The record further demonstrates that PWC "acted to provide accounting advice rather than to assist [Greenberg Traurig] in providing legal advice."  Cavallaro, 284 F.3d at 248-49.  PWC's role was described repeatedly to Iron Mountain as that of an independent auditor whose sole purpose was to conduct a royalty audit pursuant to the parties' License Agreement.  (See Frischling Aff. ¶ 6; Def. Ex. C at 1).  There is no dispute that

PWC fulfilled that role by conducting the royalty audit and delivering an audit report to CDP.  (Def. Ex. E).  What is missing, however, is any evidence that PWC participated in, much less facilitated or translated, the lawyers' provision of legal advice to their client. Thus, PWC was not retained for the purpose of rendering legal advice.

The plaintiff argues that "[i]n the highly technical computer software field, PWC's assistance has been critical in [Greenberg Traurig] understanding how, exactly, Defendants had deceived CDP, and the extent of the harm caused by Defendants."  (Pl. Opp. Mem. at 16).  However, the plaintiff has not presented any supporting evidence or pointed to any facts showing that PWC played an interpretive role between Greenberg Traurig and CDP.  The fact that PWC's auditing work may have aided CDP's counsel in its ability to advise the plaintiff does not shield the audit related materials from discovery under the attorney-client privilege.  See Ackert, 169 F. 3d at 139 ("a communication between an attorney and a third party does not become shielded by the attorney-client privilege solely because the communication proves important to the attorney's ability to represent the client").

### C.     Implied Waiver

Autonomy contends that even if the plaintiff could show that the work product doctrine or the attorney-client privilege applies in the first instance, any such protections were impliedly waived by CDP's decision to place PWC's audit work and its "independence" directly at issue in the case, and by CDP's conduct in voluntarily disclosing a copy of the interim audit report to the defendants.  (Def. Mem. at 15-20).  In light of this

court's conclusion that the requested information is not protected from disclosure, the issue of waiver does not need to be reached.  However, given the fact that it has been extensively briefed by the parties, the issue of waiver will be addressed.  As described below, the question of whether CDP's actions should result in a waiver of any privilege or work product protection is premised on issues of fairness.  This court concludes that in the event the protections relied on by the plaintiff were to apply, fairness concerns would nevertheless warrant the disclosure of the disputed materials.

### The Applicable Standard

A waiver occurs when a document otherwise privileged or protected as work product is disclosed to an adversary.  See In re Keeper of Records, 348 F.3d at 23 (finding it "crystal clear that any previously privileged information actually revealed [to third parties] lost any veneer of privilege"); In re Lernout & Hauspie Sec. Litig., 222 F.R.D. 29, 35 (D. Mass. 2004) (explaining that "waiver . . . occurs when a document otherwise protected as work product is shared with an adversary").  Similarly, waiver may be found "when a party takes a position in a case that places at issue the very information sought to be protected from disclosure[.]"  Coastline Terminals of Connecticut, Inc. v. United States Steel Corp., 221 F.R.D. 14, 17 (D. Conn. 2003) (discussing waiver of work product).  See also Savoy v. Richard A. Carrier Trucking, Inc., 178 F.R.D. 346, 350 (D. Mass. 1998) (explaining that a party waives the attorney-client privilege where, through an affirmative act such as filing suit,  the party "put the protected information at issue by making it relevant to the case" and "application of the

privilege would have denied the opposing party access to information vital to [its]

defense"). There is no dispute in this matter that CDP waived any protection over PWC's

interim audit report by disclosing the report to the defendants. Nor can there be any

dispute that CDP put the audit report directly at issue in the litigation by relying on data

and interviews conducted by PWC in support of its breach of contract and 93A claims, by

seeking over $23 million in damages based on the conclusions reached by PWC in that

report, and by seeking to hold the defendants liable for the cost of the audit pursuant to

the terms of the Licensing Agreement. At issue is whether CDP's conduct resulted in an

implied waiver of all documents and communications relating to PWC's audit.

Although the First Circuit has yet to clarify the scope of implied waivers, it has

instructed that "[s]uch waivers are almost invariably premised on fairness concerns." In

re Keeper of Records, 348 F.3d at 24. Thus, as the court stated in In re Keeper of

Records,

> "the courts have identified a common denominator in waiver by
> implication: in each case, the party asserting the privilege placed
> protected information in issue for personal benefit through some
> affirmative act, and the court found that to allow the privilege to
> protect against disclosure of that information" would have been
> unfair to the opposing party.

Id. (quoting Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence

§ 503.41[1]) (punctuation omitted)). The court also cited an advice of counsel defense as

"a paradigmatic example" of the role of fairness in the waiver analysis:

> [w]hen such a defense is raised, the pleader puts the nature of its
> lawyer's advice squarely in issue, and, thus, communications

> embodying the subject matter of the advice typically lose protection. Implying a subject matter waiver in such a case ensures fairness because it disables litigants from using the attorney-client privilege as both a sword and a shield.  Were the law otherwise, the client could selectively disclose fragments helpful to its cause, entomb other (unhelpful) fragments, and in that way kidnap the truth-seeking process.

Id. (internal citation omittted).

The First Circuit emphasized, however, that there is a distinction between extrajudicial disclosures of otherwise privileged communications and disclosures made during an ongoing litigation, noting that "[v]irtually every reported instance of an implied waiver extending to an entire subject matter involves a judicial disclosure, that is, a disclosure made in the course of a judicial proceeding."  Id.  Accordingly, it held that the extrajudicial disclosure of otherwise protected materials "not thereafter used by the client to gain adversarial advantage in judicial proceedings, cannot work an implied waiver of all confidential communications on the same subject matter."  Id.  On the other hand, "if confidential information is revealed in an extrajudicial context and later reused in a judicial setting, the circumstances of the initial disclosure will not immunize the client against a claim of waiver."  Id. at 25.

The same concerns for fairness that underlie the waiver of attorney-client privileged communications are equally applicable to waiver of work product information.  See In re Polymedica Corp. Sec. Litig., 235 F.R.D. 28, 32 (D. Mass. 2006) ("The Supreme Court relied on the same concern for fairness when it applied subject-matter waiver to the work-product doctrine").  Accordingly, a subject matter waiver of work

product material is appropriate where a party is attempting to use otherwise protected

information as "both a sword and a shield" in order to gain an unfair tactical advantage

over the opposing party.[9]  See In re Keeper of Records, 348 F.3d at 24.

## Application of Fairness Principles to the Instant Case

This court finds that the circumstances of this case present one of those situations

in which fairness requires further disclosure of information related to the PWC audit.

Here, CDP did not simply make an extrajudicial disclosure of PWC's interim audit report

to the defendants in an effort to resolve the parties' differences regarding the royalty

payments.  Rather, CDP has put the audit report, the audit process, and PWC's status as

an independent auditor directly at issue in this litigation.  Under such circumstances, full

disclosure is only fair.

Without belaboring the point, based on the record before this court, CDP

affirmatively represented to Iron Mountain that CDP had hired PWC and that PWC was

to serve as the independent auditor under the Licensing Agreement.  It further appears

---

[9]  As both parties acknowledge, the concept that implied waivers of the attorney-client privilege and work product doctrine should be grounded in fairness has been codified in Rule 502 of the Federal Rules of Evidence.  That Rule provides that a disclosure of attorney-client privileged or work product materials in a federal proceeding results in a waiver of undisclosed communications and information if "(1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together."  Fed. R. Evid. 502(a).  As the Advisory Committee Notes to Rule 502 explain, "a subject matter waiver (of either privilege or work product) is reserved for those unusual situations in which fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary."  Fed. R. Civ. P. 502 Advisory Comm. Notes, 2011 Amendment.  Therefore, fairness controls the question of waiver under Rule 502(a).

that CDP affirmatively withheld from Iron Mountain the fact that PWC had been retained by litigation counsel.  Iron Mountain would not have given PWC the access it did if it had known that PWC had been engaged by litigation counsel or that PWC was gathering information that CDP might subsequently attempt to use at trial.  Nevertheless, CDP has claimed that, based on PWC's "review of records made available by Defendants and interviews of Iron Mountain personnel," $23 million is due on its breach of contract claim.

CDP also claims that Iron Mountain's conduct throughout the parties' dispute concerning royalties, including statements given to PWC during the audit, are very relevant to CDP's 93A claim.[10]  Under such circumstances, fairness requires that the defendants be allowed to explore the full panoply of information available to PWC for its "independent" audit.  It is only fair that if Iron Mountain is to be judged based, at least in part, on its response to PWC's assessment of how royalties were to be computed and the amounts consequently found to be due, that Iron Mountain be allowed to explore the circumstances surrounding PWC's engagement, the information available to PWC, the basis for PWC's understanding of Iron Mountain's obligation, and the manner of its performance of the audit, among other things.  In fairness, CDP cannot use PWC's status and work as an independent auditor as a "sword" against the defendants, while relying on

---

[10]  In connection with its motion to strike, CDP argued that the 93A claim was a significant part of its complaint.  Thus, CDP is relying on PWC not only for its mathematical analysis, but also for the information it learned through interviews with Iron Mountain employees.

the attorney-client privilege and the work product doctrine as a "shield" to prevent disclosure of related materials.

While the plaintiff agrees that fairness concerns control the extent of any waiver, it argues that any possible harm to the defendants has been eliminated by CDP's production of all of the materials called for under Fed. R. Civ. 26(b)(4) governing discovery involving testifying experts.  (Pl. Opp. Mem. at 17-19).  In particular, the plaintiff argues that because the defendants have received all of the documents that are discoverable under the rules for testifying experts, "Defendants have everything necessary to test the basis of the audit report prepared in anticipation of litigation by PWC, an independent expert."  (Id.).

CDP's argument is unpersuasive.  As an initial matter, it is undisputed that PWC had not been retained as an expert witness at the time it performed the audit or at any time prior to the litigation.  CDP concedes as much by arguing that it is not relying on Fed. R. Civ. P. 26(b)(4) as a basis for withholding the challenged documents.  (See id. at 10-11).  Furthermore, this court does not agree, as the plaintiff asserts, that "the disclosure obligations set forth in Rule 26(b)(4) inform the fairness considerations that determine whether there has been an implied waiver[.]"  (Id.).  There is a significant difference between presenting a witness as an expert employed by a party to render opinions on behalf of that party and hiring a witness as an independent, outside auditor retained to uncover the truth about a matter over which the parties are having a dispute. While there may be policy reasons for limiting disclosure in the case of an expert

-38-

engaged for trial, there is no such policy basis for limiting the disclosure of information in the case of an accounting firm that was supposed to be unbiased and independent, and whose work was to be shared by the parties outside the setting of a courtroom battle.  The fact that CDP has made the disclosures required by Fed. R. Civ. P. 26(b)(4) does not negate its obligation to make a full disclosure of information which predates PWC's retention as an expert in this litigation.

## V.  **ORDER**

For all the reasons described above, the plaintiff's "Motion to Strike Affidavit of David A. Frischling" (Docket No. 34) is DENIED and the "Defendant's Motion to Compel Production of Documents" (Docket No. 28) is ALLOWED.  The documents shall be produced within 21 days of this Order, unless otherwise agreed by the parties.

   / s / Judith Gail Dein     
Judith Gail Dein
U.S. Magistrate Judge
